Case 17-2045, Mark Unger v. David Bergh, argument not to exceed 15 minutes per side. Mr. Hudson, you may proceed for the appellant. Good afternoon. May it please the Court, Paul Hudson on behalf of the petitioner Mark Unger. Judge Moore, I'd like to reserve three minutes for rebuttal. Fine. Your Honors, the State used junk science to convict Mark Unger of murder and put him away in prison for the rest of his life. The question here is whether Mr. Unger's trial counsel was constitutionally ineffective when he failed to protect his client from that junk science. We submit that the only reasonable conclusion is yes, and we therefore ask the Court to grant a writ of habeas corpus. Your Honors, I'd like to go straight to the issue that tripped up both the State Court and the District Court below, and that's the issue of the other stain in the case, the NSE stain. Now, Dr. McKeever testified that based on his review of the medical literature, a positive NF stain, a neurofilament stain, meant that Mrs. Unger had to have survived at least an hour and a half after her fall. To its credit, the State now concedes that there is no support in the medical literature for that conclusion, that Dr. McKeever's actual trial testimony with respect to the NF stain was junk science. The State argues that there's this other stain out there, the NSE stain, that provides some support, and I want to take that head-on because I think it is just flat wrong based on this record. First of all, Dr. McKeever and the prosecution over and over repeatedly disavowed any reliance on the NSE stain. Expressly. Expressly is right, both on direct examination, on cross-examination, again on redirect. The whole point of the redirect was to get Dr. McKeever to disavow the NSE stain, make clear that he was relying on NF only. So at that point, there was no possible strategic reason not to confront Dr. McKeever about the lack of support in the medical literature for the NF stain. Before you go too deeply into this argument, could I ask you whether the autopsy report was definitive as to whether the cause of death was blunt force trauma or drowning? The autopsy report was not definitive as to the cause of death, the manner of death. The medical examiner actually, for the first seven months, determined that the cause of death was indeterminate, and then there was a dispute at trial whether the actual cause of death was blunt force trauma or whether it was drowning itself. But I think that's why it was so powerful to the jury to hear a University of Michigan neuropathologist testify that as a matter of medical certainty, Mrs. Unger had to have been alive for at least an hour and a half, because if that's true, Mr. Unger's defense could not possibly be true. Isn't the premise of your argument that the entire determination of the jury had to hinge on whether there was this interval between her having incurred the fall and the death occurring, some say, arguably 90 minutes later, because there's all this other evidence, circumstantial evidence, though it may be, that the husband likely was responsible for her going over the ledge there, and if that could have been seen by the jury as the proximate cause of the death, how long it took her to die or whether the husband moved the body into the water so she could drown, the jury had alternative theories as to how the crime occurred. You know, it just seems that your entire argument is based upon this one thing about these stains and how long it took to die. And with the alternative theories available, I'm just wondering if the entire case hinges on what your argument hinges on. Your Honor, the prosecution built its entire case, its entire timeline, its entire theme of the case on this 90-minute timeline. They told the jury that because Dr. McKeever told them that Mrs. Unger had to have survived an hour and a half, that that meant Mr. Unger went back to his cabin, waited for the coast to be clear while his wife is lying on the slab, gurgling in her own blood, and then snuck back down like a rat in the night to drag her into the water to die. The other evidence in the case, I submit, was effectively neutralized by trial counsel at trial. Well, there was other evidence about the petitioner's suspicious actions and behavior after the crime and after the police were summoned, that he didn't want to wait around to talk to the police and wanted to leave right away. There's a bunch of circumstantial evidence in addition to what you're presenting here. Your Honor, I think the prosecutors themselves told us what they thought was important to their case, and there was certainly other circumstantial evidence. I submit that that was neutralized, but they told the jury over and over again. That's sort of speculative, isn't it, as to what the jury would have thought was important and not important? What the prosecutor told the jury is that the one thing that defense couldn't get around was Dr. McKeever's testimony, and they came back to that over and over. I counted up 19 times, set forth the litany in our brief of the times they came back to the 90-minute testimony, and that's what they built their entire case upon. And, in fact, they told the jury that this wasn't a case where Mr. Unger and Mrs. Unger got in a fight and he just pushed her over and she died shortly thereafter. They expressly told the jury, that's second-degree murder. No one is saying that Mark Unger, when he was up on the deck, premeditated the killing of Florence Unger. What they said was it was leaving her there for an hour and a half, gurgling in her own blood, that showed that this was premeditated first-degree murder perpetrated by a subhuman monster. So I strongly dispute that the prosecution, in the case they actually tried to this jury, didn't rely on this hour and a half timeline as the centerpiece of their case. Could the jury have thought, well, we don't really know about the 90-minute issue, but we think Mr. Unger pushed her over purposefully to kill her, and that that could be premeditated because that's why he encouraged her to come to the roof of this boathouse for an evening drink? And I think what that reveals is that no jury has actually heard that story. No jury has believed that story. Certainly no jury has convicted Mark Unger, beyond a reasonable doubt, of perpetrating those actions. But would that be improper for the jury to have thought that way if they had, if my total hypothetical is true? Judge Moore, it would have been improper because the prosecutor expressly told them during closing argument that that would be second-degree murder, not first-degree murder. Go ahead. On the point of second-degree murder, I mean, the jury was instructed as to second-degree murder, correct? Yes, that's correct. Is it your belief that, I mean, if we look at the record, some of the things like his behavior after the fact would be true for second-degree murder, arguably, behaving suspiciously. He might act the same way if he was guilty of second-degree murder. If we think that there's a, filtered through the habeas standard, that there's a reasonable possibility that they would have convicted him only of second had he been crossed in the manner that you're saying he should have been crossed, does that entitle you to the writ? Yes, it does. I mean, that means that the outcome would have been different. So under the Strickland standard, there is a reasonable probability that but for counsel's unprofessional errors, his failure to exclude this testimony, cross-examine, prepare his own expert, that the outcome would have been different. And that's at a minimum a conviction for second-degree murder. Is that established law that if you would have gotten convicted of a lesser, you know, included, that that warrants a grant to the writ and a retrial? I don't have a case at hand, but I think it's inherent in the Strickland standard that the outcome of the trial would have been different. And if that means a much lesser charge, not in prison for the rest of your life without possibility of parole, then that is a different outcome that would have happened but for the errors. Is the argument you're presenting to us today an argument that was presented on the petitioner's behalf in connection to the State Court of Appeals, in connection with his State Court appeal? This was brought in a 6500 motion, motion for post-conviction relief. A state collateral procedure? Yes, that's correct. And there was a Ginther hearing held. The State Circuit Court resolved this issue on the merits, did not impose any sort of procedural default, and then the Michigan Court of Appeals and Michigan Supreme Court denied leave in one-sentence orders. And what is your argument as to why we should entertain this argument that's already been reviewed by the state appellate courts in Michigan? The argument is that the Michigan State Court's unreasonably applied federal law, as established in Strickland, and our argument is that the only reasonable conclusion from a trial counsel's failure to read these articles and then use them to challenge the prosecution's key testimony in the case that establishes their hour-and-a-half timeline, that that was ineffective assistance of counsel under Strickland. How do you know the trial counsel didn't read the articles? I thought the trial counsel mumbled, well, I don't remember, I don't recall. It's true there was some hedging in the testimony. He was asked whether he recalled making any sort of analysis as to whether anything in that literature even purported to support the 90 minutes, and he said, I don't know, I don't remember if I did or if I did not. But what's truly striking, if you go through these articles, and they're in the record now at record entry 20, there are only 22 of them. Four of them are not even in English, so that should have been a pretty big red flag to any competent trial counsel that these are not what Dr. McKeever is claiming they are. There is, I would say, 20 out of 22 are just filler. The first mention of any sort of stain, NSE, is about 150 pages into it. You have to slog through an article, for example, on the history of concussions from the era of the ancients, antiquity through 10th century A.D. Before you get to any discussion of stains, there is a lot of filler in there. I think there are only two even arguably relevant articles in the ballpark sort of articles, and neither one of those says that an NF stain, an NSE stain, or any other stain stands for the proposition that somebody survived for an hour and a half. It's junk science. They've agreed to that, basically. There is a bunch of other evidence in this case. You say it was neutralized, but if she is down on that ledge for even three minutes, granted, it's easy for them to tell this story and come down like a rat and all this drama that they gave the jury, but if McKeever gets shredded on cross, but the jury still thinks, based on some of this other evidence, 10% blood in one lung, et cetera, that she was on that ledge for a few minutes, either you have this seizure theory, which seems pretty implausible, or he went down and did it after three minutes, then after 90. Well, there was expert testimony by an MIT expert who said it was perfectly plausible that she fell over the deck accidentally, hit the concrete ledge, and ended up in the water nearly immediately. And how does she get 10% blood in one lung? I mean, she's aspirating that. Dr. Schmidt, the defense expert, clarified that that can happen on a single inhalation of blood. The other blood testimony was that there's 20 to 60 milliliters of blood on the concrete slab, and that is a remarkably small amount of blood for a skull fracture like this. I mean, that's a children's Tylenol dose. The officer said it was a three-foot pool of sort of diluted blood, I think. The amount of blood was never actually measured, and so the prosecution's expert, Dr. Cole, estimated between 20 and 60 milliliters, which is about a shot glass worth of blood, and I think there had been some precipitation, and so it had diluted. If there's a pool two to three feet, they had a witness, right, who says there's a pool of something two to three feet wide. I mean, that's not going to come out just as you sort of bounce along the way down. It's this much blood, and she had a bashed-in, fractured skull, and Dr. Schmidt testified that that amount of blood would come out on an immediate impact being emitted through her nose. I mean, if she's lying there on the slab for any extended amount of time, Dr. Schmidt said there would have been a lot more blood, and I think that would resonate with the jury just based on common sense. If she's lying there with a bashed-in skull, she's going to be bleeding pretty profusely from this sort of catastrophic head injury. So I do think that the actual physical testimony based on to establish any sort of survival time on that slab is essentially nonexistent. It was neutralized by the trial counsel. Okay. Thank you. Thank you, Your Honors. Good afternoon, Your Honors. May it please the Court. Assistant Attorney General Andrea Christensen-Brown, also with me at the trial counsel table is Assistant Attorney General John Palos. Excuse me. Habeas relief is an extraordinary remedy, and petitioner's burden under Strickland is high, doubly so when considered in tandem with AEDPA, and we would suggest that Mr. Unger has not met that burden. The Court is well aware that Strickland is a two-part test comprised of both deficient performance and prejudice, and if I may, I'd like to spend my short time here with you discussing prejudice, which Your Honors have already really gotten into. So to jump... Did the state court misapply the prejudice standard here? Regarding, there are two claims here, ineffective assistance of counsel as related to the expert testimony with Dr. McKeever, and ineffective assistance of counsel for failing to object to the prosecutorial misconduct. With respect to the prejudice prong of the prosecutorial misconduct claim, that was an incorrect standard. We concede that that's de novo before this Court. So proceeding on to the prejudice component, our position is that Mr. Unger just simply overestimates the importance of Dr. McKeever's testimony. Well, my goodness, 19 times. Respectfully, that is his count. We have to evaluate it on the way it went in. Strickland or one of these cases tells us that, right? I mean, we have to evaluate the case as it was tried, and would it have been different if he got totally taken apart on cross, which it looks like he could have been. As the case went in, as Your Honor states it, Dr. McKeever was one witness of 47. So to wrap up the entire prosecution's theory, which, mind you, during closing argument is just a theory. That's why closing arguments are not considered evidence. So to hold a jury to be mandated, you find what the prosecution says happened or you don't find guilt, that's not what jurors are held to. Jurors are instructed that they consider all of the evidence that's properly admitted, and closing arguments are not considered evidence. Yeah, and so we need to figure out, you know, was there enough evidence of premeditation in particular? Not just that he murdered her, but premeditation. Correct. Absolutely correct, and we submit that there is. First, not only was that evidence that Florence Unger was alive on that concrete slab, for at least a certain amount of time. Whether it was 90 minutes, as Your Honor, Judge Clay pointed out, or whether it was three minutes, as Your Honor pointed out, no matter the amount of time. She laid there for a while specifically based on that blood evidence, the pool of blood that you were discussing. True, Dr. Schmidt said that that could happen with one spurt of blood, but what Dr. Schmidt was not able to point to was a source of that blood. She suffered a massive head trauma. However, both pathologists for the prosecution, one who performed the autopsy and one who effectively consulted, both said that a spurt of blood to match that amount, 60 milliliters is 2 ounces. So to spurt out up to that amount of blood, that blood has to have a source, whether it be a severed arterial vessel or a fracture of the nose, and neither of those were found during the autopsy. Now, when Dr. Schmidt testified, he said, well, there must have been something. It might happen that you can spurt it out in one motion. However, that was not supported by the autopsy findings here. So we would submit that that evidence was effectively unchallenged. And beyond that, there was additional evidence of premeditation, which we know that the jury considered, that Your Honors have extensively mentioned already. His odd behavior, packing up the car and wanting to leave within 90 minutes. Second-degree too, though. Pardon me? If he had committed second-degree murder, I think he could be acting just as oddly. Absolutely. However, when the jury is instructed as to premeditation, they are able to consider all circumstances surrounding the crime, which includes before, during, and after. And so his behavior, while it goes to second-degree murder as well, also goes to premeditation. All of this is evidence they can consider. It goes to murder. I don't think it goes specifically to premeditation. That's what the jurors were instructed, Your Honors. I don't have a page site to give you. However, during the instructions when jurors are considering premeditation, it's not only the timing, able to take a second look, it's all of the circumstances surrounding the killing. So you can consider. I understand your point. Okay. It's not specific to premeditation, but it supports that as well as second-degree murder. Absolutely, yes. Yes, that's the point, Your Honor. And I would also, not just the bizarre behavior at the scene, he was also telling inconsistent stories to friends in the days and weeks after Florence's death. He told one friend that he tried to get her out of the water, but she was too heavy. He told another friend that he tried to get her out of the water, but blood started coming out of her head, so he stopped. We know from testimony from Lynn Duncan, who was with Mr. Unger when he entered the water, that he never laid a hand on Florence. So why the discrepancy there? Why would you tell people you tried to get your wife out of the water? What forensic evidence do you have, other than the small amount of blood, that this was premeditated? The other, well, in addition to the bizarre behavior at the scene, we also have other medical evidence that I would point to. The blunt force trauma to the belly cavity. There were marks that weren't indicative of any other pattern, such as from a railing or from the boat hoist, which are long, lengthy beams. I'm sure your hunters know what a boat hoist looks like. But they didn't match any of those. Why isn't Dr. Schmidt correct that that could have happened during the fall? We submit that it couldn't have happened during the fall because there was nothing that could match up to that sort of injury other than a fist or a kick, which was what both Dr. Cole and Dr. Dragovic testified to. There's a lot of dueling expert testimony on these forensic points, other than the discredited 90-minute testimony. I mean, if there's kind of just dueling experts and they almost cancel each other out, why isn't there a reasonable possibility that they would have gone for second degree rather than first? I'm not hearing a slam-dunk response to some of their, I don't know who's right, but some of their arguments on these forensic points. Point taken, point taken. But that's actually the beauty of this, is that there were dueling experts on both sides. Therefore, you have counsel who is presumed competent, who is putting on a case with a Wayne County medical examiner testifying for the defense, an MIT professor testifying for the defense with animations that were used to support their theory that she tumbled over the railing and into the water. So we are dealing with counsel who has presented one of the most thorough and comprehensive defenses that I've seen in my 10 years of doing this work. How can you say that when you have the apparent fact that the counsel didn't read these articles, which didn't support this theory that is then relied on by the prosecutor, who I know you're not that person, but the prosecutor at trial again and again. And how can anyone sanely say it is a strategy for the lawyer not to decimate the state's expert? When it comes to decimation, I think that we can look actually at the trial court's opinion. When it comes down to it, my friend on the other side and I fundamentally disagree about what the content of these articles say. And never did I admit that it was junk science. Not even the scientists, excuse me, the doctors who testified at the Ginther hearing. None of them used the term junk science. It was a matter of interpretation, how you interpret these articles. None of these articles support 90-minute opinion based on the NF test. I would disagree with that, Your Honor. Really? I believe that the Ogata study, that was number 11 in Dr. McKeever's list of articles. And as Mr. Hudson pointed out in one of his pleadings, it's a very short article. It's six pages. I think that it would be very telling for Your Honors to look at it. I don't see it. There's like a reverse logic here that if there's a negative result and 90 minutes didn't pass, then they might have still had that injury. I mean, the injury can show up before 90 minutes. But if it doesn't show up before 90 minutes, there is the possibility that had the person lived for 90 minutes, it would have shown up. Yeah, it's like a reliability standard. It is. It's strange. And honestly, I'm a lawyer. It's hard for me to understand these articles as well. I thought this was on the ground. I mean, the articles just don't support it. He could have been annihilated. And the difference, I think, where one might disagree with the trial court. The trial court thinks it's fine. I actually have crossed Dragovich once, myself. He's quite a character. Dr. Dragovich. Oh, yes. Yes. Yes. He's very animated. Oh, yeah. He's quite a character. But the trial court seems to think it's fine just to have Schmidt do the work. But to have McKeever himself in the box admit on cross or recross that these articles that he's been relying upon don't support his opinion. I mean, that would have been just uniquely devastating. It would have been powerful. I don't say that if he were to have – if defense counsel would have taken the step of cross-examining on this issue, the jury probably would have taken it. I don't know what the jury would have done, but it would have been interesting to see. It would have been. It would have been very interesting. But to say that counsel did not read the articles, number one, I think that's not true. That's the problem. I'm sorry? I mean, as opposing counsel points out, the problem ultimately is that he did not cross-examine McKeever based on the articles. Not whether – if he read them and didn't want to do anything, one could argue, I mean, that's like the worst decision ever. But what I will say is that certain points that my friend on the other side points to that would have been a decimation, if you'd like to use that word, were also things that were explored during Dr. Schmidt's testimony. And I would just like to point these out, that Dr. Schmidt, during his testimony – excuse me, actually during the direct by Mr. McGuire, by defense counsel, he stated that NSE really isn't a good marker. So that's what these experts testified to during the Ginther hearing. And Dr. Schmidt also testified to neurofilament, the NF test, isn't used as a marker for axonal injury. And that's also what the experts testified to at the Ginther hearing. So while the cross-examination of McKeever may not have been what Mr. Unger wanted, while the expert for the defense may not have presented this evidence in such a showy fashion, the underpinnings were there, and they were before the jury. I think one thing we can fairly conclude – I'm not saying it leads one place or another, but I think we can fairly conclude that if he gets crossed based on those articles, this 90-minute mantra goes away immediately. And we don't have 19 references to 90 minutes. We don't have the creeping like a rat and all this drama. None of that. It's really a different case from that point forward. And I guess that's the challenge of trying to evaluate what might have happened. And when you isolate Dr. McKeever's testimony and the potential for cross, I understand your point, point taken. However, when you do consider the 46 other witnesses, the 250 exhibits, the 3,900 pages of transcript that we have here, this case was not wrapped up in one witness. Which are the two best pieces of evidence? Our two best pieces of evidence? Best, yep. The other stuff, premeditation, two best pieces. Premeditation, I have to go to the blood evidence, both on the concrete and in her lungs, the 10% in one, 2% in the other. And, well, to be completely frank, Your Honor, there's a lot to choose from. I would also say blood evidence primarily and the evidence of dragging tied with his bizarre behavior. All of this goes to premeditation. So that being said, I just want to reiterate that counsel is presumed effective. This was a very comprehensive defense. And Mr. Unger was very well served by it. So unless there are further questions, I would request that this court affirm. Thank you. Thank you. How about the abrasion? I mean, your guy says it's an impact abrasion. I mean, why can't the jury believe them that she's dragged? I think the point of all this other evidence is that it was, at a minimum, stalemated. So on the abrasion evidence, one expert testifies that these are impact abrasions, not linear abrasions. If she was dragged across this rough concrete, there would have been significant evidence of that. There would have been evidence of the blood being dragged across the concrete. You didn't hear any of the evidence along those lines. And I'll put a fine point on it for prejudice purposes. With Dr. McIver's testimony, the defense was scientifically impossible. Without his testimony, if it had been eviscerated on the stand, the defense goes from scientifically impossible to consistent with the scientific evidence. We know that axonal injury can appear in cases of instantaneous death because these cellular processes go on for 10 to 15 minutes after cessation of breathing or heart stopping. So that's, I think, why this case, beyond any other case I've seen, is a case where the scientific evidence that should have been completely eliminated from the case, that the prosecution relied on time and time again, shows just how prejudicial all of this was. What about this Ogata part? Nowhere in that study does it say that if there's a positive NSE stain, that means the person lived for at least an hour and a half. And in fact, there's a chart on page 6014 that notes that in three out of five cases of short survival times, that is less than an hour and a half, the NSE stain did pick up axonal injury. So more often than not, the NSE stain was picking up axonal injury in cases of survival of less than an hour and a half. So there is no way to read that study and conclude that the medical literature is saying a positive NSE stain means an hour and a half of survival time. That's, I think, as simple as you can put it. It has nothing to do with NF, first of all, and none of the other articles do either. But if this is the one article that the prosecution is relying on, that article does not stand for the proposition that a positive stain of any sort means the victim survived for at least an hour and a half. What I'm getting from your argument is that you think the scientific evidence is so compelling that all the other evidence is rendered irrelevant. Well, not irrelevant, Your Honor, but Strickland does instruct that there are some evidentiary issues that are so important to the case that if you take out the counsel's unconstitutional errors, that that would have a pervasive impact on the other evidence in the case. And I think that this is the poster child for that case. Because what you've got here are warring experts, evidence which, if it had been properly cross-examined, we don't know what is rather speculative as to what impact that would have had on the jury. And lots of other evidence as to motive and opportunity, which by themselves might have or well would have resulted in the verdict. For example, purportedly the witness who was summoned to the scene says that your client couldn't see because of foliage and other things along the water there, couldn't see where the body would be in the water, yet he went straight directly to where the body was. There's evidence. I'm just saying there's other evidence. That was debunked expressly at trial, that the innkeeper was walking straight up the path from that direction. Say that again? I was just saying that there's plenty of other evidence here as to circumstances, motive, opportunity, everything else, and yet you would have us believe that the whole case would have been decided based upon proper examination of the witnesses as to the scientific evidence, assuming even that the examination was improper, which is obviously contested. I submit this would have been one of the most devastating crosses that anybody has ever seen. A prosecution witness gets up there and says, I know as a matter of scientific certainty that this victim survived for at least an hour and a half after her fall. And then the trial lawyer gets up. How can anything be certain in this case from a scientific standpoint when the autopsy is even equivocal as to the cause of death?  Say that again? You start talking before I stop talking. I missed the first part of your sentence when you do talk. I apologize, Your Honor. I think you are absolutely right that there was a lot of medical uncertainty in this case. The one piece of evidence that was not uncertain, that was completely unchallenged, was Dr. McKeever's testimony that she had to have lived for an hour and a half after the fall. Everything else was equivocal. It was rebutted. This is the one piece that the defense just did not challenge in any meaningful way, and that was the ballgame. If the jury hears unrebutted from a prosecution expert that this woman was alive for an hour and a half, case is over. There's no way for the jury to find that this was not premeditated murder. If the trial counsel had cross-examined it effectively, had eviscerated this in cross-examination, this would have been an entirely different case. Your Honor, we acknowledge that the habeas standards are exceptionally high. We've embraced them at every turn in this case. This is the exceptionally rare case where there's been an extreme malfunction in the justice system. We urge the court to grant a writ of habeas corpus. What do you think caused the Michigan courts to say the opposite of what you're urging and requiring us to say that they're unreasonable? Yes, Your Honor. I think the primary issue was this Ogata study, the idea that there was this NSE stain out there that provided some sort of something in the back pocket for the prosecution. So even if McKeever had been eviscerated on the stand with respect to the NF testimony, there was this other stain out there. But if you take that apart, which I think we have, then there's nothing there. And so it's unreasonable for the state court to conclude that there was no prejudice from this, particularly when the prosecution hammers over and over again that this is their primary piece of evidence in the case. This is what they've built their entire theme of the case on. Thank you. Thank you, Your Honors. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?